

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 15, 2022**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Reagor-Dykes Motors, LP, et al.,[1] | § | Case No.: 18-50214-RLJ-11 |
| | § | Jointly Administered |
| Debtors. | § | |
| | § | |
| | § | |
| Dennis Faulkner, as Trustee of the Creditors Trust, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 20-05028 |
| | § | |
| Lone Star Car Brokering, LLC, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

---

[1] The following chapter 11 cases are jointly administered in Case No. 18-50214: Reagor-Dykes Motors, LP, Reagor-Dykes Imports, LP (Case No. 18-50215), Reagor-Dykes Amarillo, LP (Case No. 18-50216), Reagor-Dykes Auto Company, LP (Case No. 18-50217), Reagor-Dykes Plainview, LP (Case No. 18-50218), Reagor-Dykes Floydada, LP (Case No. 18-50219), Reagor-Dykes Snyder, L.P. (Case No. 18-50321), Reagor-Dykes III LLC (Case No. 18-50322), Reagor-Dykes II LLC (Case No. 18-50323), Reagor Auto Mall, Ltd. (Case No. 18-50324), and Reagor Auto Mall I LLC (Case No. 18-50325).

On July 31, 2020, Dennis Faulkner, the trustee of the creditors' liquidating trust in the debtors' bankruptcy cases ("Trustee"), filed his complaint seeking to recover transfers made to the defendant, Lone Star Car Brokering, LLC ("Lone Star"), under 11 U.S.C. §§ 547, 548, 549, and 550.[2]  Lone Star now moves for summary judgment on the Trustee's § 547 preferential transfer claim.[3]  As explained below, the Court denies Lone Star's motion.

## BACKGROUND

This adversary proceeding arises under the jointly administered chapter 11 bankruptcy cases of Reagor-Dykes Motors, LP, et al. ("Debtors").[4]  Prior to filing bankruptcy, the Debtors operated as a consolidated auto group with eight car dealerships across seventeen locations. During July 2018, Ford Motor Credit Company, a primary financier of the Debtors' operations, concluded that some of the Debtors had violated the terms of their financing agreement, and Ford ceased to provide additional funding.  As a result, the Debtors were unable to sustain their business operations.  On August 1, 2018, six of the Debtors filed their bankruptcy petitions, followed by the other five on November 2, 2018.  On July 10, 2020, the Court confirmed the Debtors' bankruptcy plan, which provided for the creation of a creditors trust and the appointment of a trustee with the authority to assert causes of action under chapter 5 of the Bankruptcy Code.

Lone Star transported vehicles for the Debtors from June 2016 through August 1, 2018. Lone Star issued invoices to the Debtors, which were due on receipt, and received payment

---

[2] On June 21, 2021, the Court issued a Memorandum Opinion and Order ruling that the Trustee's § 548 cause of action was not adequately pleaded and failure to amend the complaint would result in dismissal of the cause.  Adversary No. 20-05028, ECF Nos. 20 and 21.  Per the Trustee's status update filed on June 23, 2021, "[t]he Trustee does not intend to amend [his] complaint regarding causes of action under 11 U.S.C. § 548, but will pursue causes of action under 11 U.S.C. § 547."  Case No. 18-50214, ECF No. 2199 at 3.

[3] "Section" or "§" refers to chapter 11 of the Bankruptcy Code unless otherwise stated.

[4] The Debtors in the jointly administered bankruptcy cases are listed in note 1.

through checks from a bank account under the name "Spike Dykes Ford Lincoln." That name was an alter-ego of the Debtors, and the bank account was owned and controlled by them.

Lone Star continued to transport vehicles for the Debtors, issue invoices, and receive payments during the ninety days before the first Debtors filed bankruptcy—the preference period of § 547. Lone Star received four checks from the Debtors during the preference period totaling $33,225. The Debtors issued a $4,375 check on May 22, 2018, a $14,200 check on May 31, 2018, an $11,250 check on July 12, 2018, and a $3,400 check on July 20, 2018 (collectively, the "Transfers"). The Trustee contends that the $3,400 check did not clear the Debtors' bank account until after the commencement of the Debtors' first bankruptcy filings. The checks constituted payment for a total of forty-eight invoices issued at various times.

## DISCUSSION

### I. Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[5] "A fact issue is material if its resolution could affect the outcome of the action." *Peel & Co. v. Rug Mkt.*, 238 F.3d 391, 394 (5th Cir. 2001). The movant bears the initial burden of identifying portions of the pleadings and discovery that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the movant does meet its burden, the nonmovant must go beyond the pleadings and designate specific facts showing that a genuine issue of material fact exists for trial." *Roberson v. Game Stop, Inc.*, 395 F. Supp. 2d 463, 468 (N. D. Tex. 2005), *aff'd*, 152 F. App'x 356 (5th Cir. 2005). On a preferential transfer action, when "the parties agree completely as to what payments were

---

[5] Rule 56 is applicable to bankruptcy proceedings under Rule 7056 of the Federal Rules of Bankruptcy Procedure.

made[,] . . . when [they were made], and for what," the material facts are not in dispute.

*Yaquinto v. Arrow Fin. Servs. (In re Brook Mays Music Co.)*, 418 B.R. 623, 625 (Bankr. N.D.

Tex. 2009).

"[T]he court must review all of the evidence in the record, but make no credibility

determinations or weigh any evidence." *Peel & Co.*, 238 F.3d at 394.  The facts and inferences

to be drawn from the evidence must be viewed in the light most favorable to the nonmoving

party. *Id.*

## II.      Preference Claim – § 547(b)

Lone Star argues it is entitled to summary judgment on the Trustee's preference claim

under § 547(b).  Under that section, a trustee may avoid a transfer of a debtor's interest in

property if the transfer was:

> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer
> was made;
> (3) made while the debtor was insolvent;
> (4) made--
>> (A) on or within 90 days before the date of the filing of the petition; or
>> (B) between ninety days and one year before the date of the filing of the
>> petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if--
>> (A) the case were a case under chapter 7 of this title;
>> (B) the transfer had not been made; and
>> (C) such creditor received payment of such debt to the extent provided by
>> the provisions of this title.

§ 547(b).

Lone Star argues that the Trustee cannot prevail as a matter of law on his preference

claim because he has failed to provide sufficient evidence to show the Transfers were made on

account of an antecedent debt owed by one of the Debtors.  The Bankruptcy Code defines "*debt*"

as a "liability on a *claim*." § 101(12) (emphasis added). A "*claim*" is a "right to payment,

whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent,

matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." § 101(5).

"A debt is 'antecedent' for purposes of § 547(b) if it was incurred before the alleged preferential

transfer." *Baker Hughes Oilfield Operations, Inc. v. Cage (In re Ramba, Inc.)*, 416 F.3d 394,

399 (5th Cir. 2005).

The Trustee introduced the invoices from Lone Star which underlie the Transfers; Lone

Star introduced the checks it received as payment for each invoice. Lone Star does not rebut the

sufficiency of this proof. An antecedent debt existed and was owed by a Debtor. Indeed, Lone

Star admitted in its Rule 26 disclosure that it sent invoices and received checks from the Debtors.

Trustee's Resp., Ex. 1 at 2 [ECF No. 40].[6] But now it argues that the Trustee must identify the

specific Debtor that owed the antecedent debt. The checks sent to Lone Star came from a bank

account with a name that does not match any of the Debtors, though the Trustee says the Debtors

controlled and operated the account. Lone Star argues that the Trustee's preference claim must

be denied because he failed to identify which Debtor owed an antecedent debt.

Some courts have held that "[i]n a [preference] case with multiple debtors, … the

Complaint must sufficiently allege which debtor owed the antecedent debt and that the same

debtor made the preferential transfer." *THQ Inc. v. Starcom Worldwide, Inc. (In re THQ Inc.)*,

No. 12-13398, 2016 WL 1599798, at *3 (Bankr. D. Del. Apr. 18, 2016); *see also Miller v.

Mitsubishi Dig. Elecs. Am. Inc. (In re Tweeter Opco)*, 452 B.R. 150, 154–55 (Bankr. D. Del.

2011). These courts require the identification of a specific debtor "to ensure that the defendant

receives sufficient notice of what transfer is sought to be avoided." *Miller*, 452 B.R. at 154;

*THQ Inc.*, 2016 WL 1599798, at *3. Contrarily, in *O'Connor v. DL-DW Holdings, L.L.C.*, the

court held that a trustee over a consolidated bankruptcy case of multiple debtors did not need to

---

[6] "ECF No." hereinafter refers to the numbered docket entries in Adversary No. 20-05028, unless otherwise stated.

identify which particular debtor owed the debt underlying a fraudulent transfer claim. *(In re Extended Stay, Inc.)*, No. 09-13764-JLG, 2020 WL 10762310, at *66 (Bankr. S.D.N.Y. Aug. 8, 2020). While the court noted that a particular debtor ordinarily must be identified, it held that such requirement should be relaxed for trustees because of their lack of history with the debtors, and it determined the trustee there had provided otherwise sufficient information to provide the defendants notice of the particular transfers at issue. *Id*. at *63, *66.

Like *O'Connor*, the Trustee lacks a history with the Debtors. And like *O'Connor*, he has described the services rendered by Lone Star and the price owed by the Debtors thereby providing notice to Lone Star of which transfers are allegedly preferential. Still, at some point in the case, a specific debtor must be identified. This is not a non-issue, as the Trustee suggests. The Debtors' bankruptcy cases have not been substantively consolidated—if the Trustee prevails on his action, then it must be known to which Debtor's estate damages are owed.

The invoices the Trustee introduced were sent to "Spike Dykes Ford Lincoln Mercury," which essentially matches the name on the checks to Lone Star—"Spike Dykes Ford Lincoln." The address on the checks is in Lamesa, Texas, and the checks were sent from a bank account with Lamesa National Bank. The parties agree that "Spike Dykes Ford Lincoln (Mercury)" is an alter-ego of the Debtors. The Trustee has not pleaded or proved which Debtor entity owned the vehicles that were shipped by Lone Star. Fortunately, one of the Debtor's bankruptcy filings may provide the answer.

The bankruptcy petition for one of the Debtors, Reagor-Dykes Motors, LP, says that entity was "doing business as" Spike Dykes Ford Lincoln. Case No. 18-50214, ECF No. 1. No other Debtor's bankruptcy petition reflects such a designation. While Reagor-Dykes Motors, LP's bankruptcy petition says its principal place of business was in Lubbock, it says its principal

assets were located in Lamesa. *Id*. The Schedule A/B filed by Reagor-Dykes Motors, LP

reflects that it leased the property in Lamesa, where the former Spike Dykes Ford Lincoln

dealership was located. Case No. 18-50214, ECF No. 421 at 18. The bankruptcy petition and

schedules of this Debtor therefore provide some evidence that Reagor-Dykes Motors, LP was the

Debtor that owed the antecedent debts to Lone Star.

The Court may "take judicial notice . . . of its own docket and of pleadings filed in cases

before it." *In re Kleibrink*, 346 B.R. 734, 744 n.8 (Bankr. N.D. Tex. 2006) (citing *Garrett v.

Comcast Commc'ns, Inc.*, No. 3:04–CV–0693–P, 2004 WL 2624679 (N.D. Tex. Nov.17, 2004)),

*aff'd*, No. 3:07-CV-0088-K, 2007 WL 2438359 (N.D. Tex. Aug. 28, 2007), *aff'd*, 621 F.3d 370

(5th Cir. 2010); *see also* Fed. R. Evid. 201.[7] The Court takes judicial notice of Reagor-Dykes

Motors, LP's bankruptcy petition and that it reveals that Reagor-Dykes Motors, LP was doing

business as Spike Dykes Ford Lincoln. *See* Case No. 18-50214, ECF No. 1. This does not

necessarily provide conclusive evidence that Reagor-Dykes Motors, LP is the entity that owed

the antecedent debts to Lone Star. As the Court may not decide issues of fact at the summary

judgment stage, it denies Lone Star's request for summary judgment on the Trustee's substantive

preference claim.

**III.    "New Value" Defense – § 547(c)(4)**

Lone Star argues it is entitled to summary judgment on some of the Transfers because it

"gave new value to or for the benefit of the debtor." § 547(c)(4). Even if all the elements of

§ 547(b) are met, a transfer may not be avoided if it meets the elements of the "new value"

preferential-transfer exception. *Id*. Under this exception, a trustee may not avoid a transfer:

> to or for the benefit of a creditor, to the extent that, after such transfer, such creditor
> gave new value to or for the benefit of the debtor—

---

[7] The Federal Rules of Evidence are applicable to bankruptcy proceedings under Rule 9017 of the Federal Rules of Bankruptcy Procedure.

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

*Id*. "This defense aims to protect creditors who have furnished and been paid for ongoing supplies or revolving credit to a debtor in distress, because such transactions fortify the debtor's business and may avert bankruptcy." *G.H. Leidenheimer Baking Co., Ltd. v. Sharp (In re SGSM Acquisition Co., LLC)*, 439 F.3d 233, 241 (5th Cir. 2006).

### a.  Henderson's Affidavit

Lone Star argues that it provided $12,800 worth of services, which are subject to the "new value" defense.  However, in its motion for summary judgment, Lone Star cites exclusively to the affidavit of Yvonne Henderson, manager of Lone Star.  Henderson states simply that "[Lone Star] provided over $12,800.00 of services for delivering cars for the Debtors which remained unpaid as of the date of the bankruptcy filings."  Def.'s Mot. for Summ. J., Appx. at 44 [ECF No. 35-2].  It provided no invoices or other evidence in its motion to support its claim of new value.

The vague and conclusory affidavit is not sufficient to establish Lone Star's "new value." *See Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 161 (5th Cir. 2021).  There is no description of the transactions which would constitute the supposed $12,800 of new value nor any underlying invoices admitted with the motion to corroborate the statement.  The conclusory self-serving nature of Henderson's affidavit brings her credibility into question, and credibility of a witness cannot be decided at the summary judgment stage.  *Id*.

### b.  Invoices Attached to Lone Star's Reply Brief

Lone Star's reply includes invoices that it argues prove new value.  The reply, however, was filed with the Court thirty-four minutes before the hearing on the motion.  The Bankruptcy

Rules require that "any written response [to a motion] shall be served not later than one day before the hearing, unless the court permits otherwise." Fed. R. Bankr. P. 9006(d). "[T]he purpose of this rule is to insure that the party opposing a motion for summary judgment be given sufficient time to respond to the affidavits filed by the moving party so as to avoid any undue prejudice." *Commc'n & Studies Int'l, LTD. v. Bank of Am., N.T. & S.A. (In re World of Eng., N. V.)*, 19 B.R. 594, 596 (Bankr. N.D. Ga. 1982). A court need not consider late-filed evidence or new facts that are raised for the first time in a reply brief. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894–98 (1990); *Clark v. Cnty. of Tulare*, 755 F. Supp. 2d 1075, 1090 (E.D. Cal. 2010).

By including the new evidence with its reply, Lone Star effectively prevented a response by the Trustee. (The filing of a sur-reply requires court approval. *See* Northern District of Texas Bankruptcy Court Local Rules, § 7056-1(g).) The Trustee had no meaningful opportunity to present refuting evidence or rebuttal arguments. Because Henderson's affidavit raises issues of credibility and the invoices were attached to a late-filed reply, the Court denies summary judgment on Lone Star's $12,800 new-value defense.

### c. The $3,400 Transfer

The same goes for Lone Star's argument that its deliveries underlying the $3,400 transfer, which the Trustee claims cleared Lone Star's bank account postpetition, should count as new value if the Trustee succeeds in recovering the payment under § 549. This argument was also raised for the first time in Lone Star's reply, giving the Trustee no time to prepare a response. "Courts generally will not consider arguments raised for the first time in a reply brief" because "[d]oing so would deprive the non-movant of a meaningful opportunity to respond." *White v. City of Red Oak, Tex.*, No. 3:13-CV-4477-P, 2014 WL 11460871, at *1 (N.D. Tex. July 31,

2014) (internal quotations omitted).  The Court denies summary judgment on whether the

deliveries underlying the $3,400 transfer constitute new value.[8]

### IV.    "Ordinary Course of Business" Defense – § 547(c)(2)

Lone Star argues it is entitled to summary judgment because the Transfers were made "in

the ordinary course of business."  § 547(c)(2).  Even if all the elements of § 547(b) are met, a

transfer may not be avoided if it meets the elements of the "ordinary course of business"

preferential-transfer exception.  *Id*.  Under this exception, a trustee may not avoid a transfer:

> to the extent that such transfer was in payment of a debt incurred by the debtor in
> the ordinary course of business or financial affairs of the debtor and the transferee,
> and such transfer was—
>> (A) made in the ordinary course of business or financial affairs of the debtor
>> and the transferee; or
>> (B) made according to ordinary business terms.

§ 547(c)(2).  "The ordinary course of business defense provides a safe haven for a creditor who

continues to conduct normal business on normal terms."  *Templeton v. O'Cheskey (In re Am.*

*Hous. Found.)*, 785 F.3d 143, 160 (5th Cir. 2015) (quoting *Gulf City Seafoods, Inc. v. Ludwig*

*Shrimp Co., Inc. (In re Gulf City Seafoods, Inc.)*, 296 F.3d 363, 367 (5th Cir. 2002)).

Section 547(c)(2) is an affirmative defense, and the defendant bears the burden of proof.

*Gulf City Seafoods*, 296 F.3d at 367.  The defendant must show that the transfer meets either the

subjective test of § 547(c)(2)(A) or the objective test of § 547(c)(2)(B) of the "ordinary course of

business" exception.  "[T]he objective test seeks to determine whether [the transfers] were

'ordinary in the industry.'"  *Reed v. Walton (In re BFN Operations LLC)*, 607 B.R. 551, 561

---

[8] Although the Court will not decide this issue on this summary judgment motion, it notes that a creditor's advances may still count as new value for the defense even if a subsequent transfer paid for that new value, so long as the subsequent transfer was not "otherwise unavoidable." § 547(c)(4)(B); *see also Laker v. Vallette (In re Toyota of Jefferson, Inc.)*, 14 F.3d 1088, 1093 (5th Cir. 1994).  Not only Lone Star's deliveries underlying the $3,400 transfer, but many, if not most, other deliveries conducted during the preference period may also count as new value as the Trustee asserts the payments for those deliveries are preferential transfers and thus not "otherwise unavoidable." § 547(c)(4)(B).  But since Lone Star did not argue that any additional deliveries constituted new value (save the illusory $12,800), the Court will not find so here.

(Bankr. N.D. Tex. 2018) (quoting *In re ACP Ameri-Tech Acquisition, LLC*, No. 09-90082, 2012 WL 481582, at \*7 (Bankr. E.D. Tex. Feb. 14, 2012)).  "The subjective test examines whether the transfers were ordinary in light of 'each party's respective practices.'"  *Faulkner v. Broadway Festivals, Inc. (In re Reagor-Dykes Motors, LP)*, No. 18-50214-RLJ-11, 2022 WL 120199, at \*5 (Bankr. N.D. Tex. Jan. 12, 2022) (quoting *In re C.W. Mining Co.*, 798 F.3d 983, 989 (10th Cir. 2015)).

Lone Star argues that the Transfers are subject to the "ordinary course of business" exception under the *subjective* test.  This requires a "peculiarly factual analysis" of the business practices that are unique to the parties.  *Gosch v. Burns (In re Finn)*, 909 F.2d 903, 907 (6th Cir. 1990) (internal quotations omitted).  To determine whether transactions were ordinary under the subjective test, courts consider whether the timing or amount of payments differed from past practices, whether the creditor-transferee took advantage of the debtor's known deteriorating financial condition or engaged in unusual collection efforts, and the length of time the parties were engaged in transactions.  *See Broadway Festivals*, 2022 WL 120199, at \*6; *Plan Admin. Agent v. Nat'l Shelter Prods. (In re Kevco, Inc.)*, No. 4-03-04051-BJH, 2004 Bankr. LEXIS 332, at \*15–16 (Bankr. N.D. Tex. Mar. 25, 2004).

### a.  Preference Period Payments

During the preference period, Lone Star engaged in no unusual collection practices, and Lone Star was not aware of any financial difficulties the Debtors faced.  Lone Star continued to service the Debtors on the same terms and conditions as before the preference period and continued to send invoices to the Debtors in ordinary fashion.  These facts all indicate that the Transfers were made in the ordinary course of business.

### i. Differing Methods of Analysis – the "Range" Method and the "Standard Deviation" Method

Central to the ordinary course of business analysis is a comparison of the amount and timing of payments during the preference period to the amount and timing of payments during the parties' pre-preference history. *Plan Admin. Agent v. Coastal Indus. (In re Kevco, Inc.)*, No. 4-04-04239-BJH, 2005 WL 6443621, at *14–15 (Bankr. N.D. Tex. June 30, 2005). Lone Star urges the Court to conduct this analysis through a "range" method. Lone Star first looked to the entire historical period of the parties' business transactions up to the preference period, which ran from June 2016 through May 2018. It calculated that during that period, the maximum number of days between shipment and payment was ninety-seven days, and the minimum number was zero. The maximum number of days between delivery and payment was also ninety-seven days, and the minimum number was negative one.

Lone Star encourages the Court to compare these date ranges to those within the preference period. It notes that during the preference period, the maximum number of days between shipment and payment was ninety-seven days, and the minimum number was fourteen. The maximum number of days between delivery and payment was ninety-six days, and the minimum number was twelve. Lone Star argues that because all payments within the preference period fell inside the date range of the historical period, no single payment was made outside the ordinary course of business. Courts commonly conduct "ordinary course" analyses using the "range" method, but only if the date range of the historical period is not excessively long. *Stanziale v. Superior Tech. Res., Inc. (In re Powerwave Techs., Inc.)*, No. 13-10134 (MFW), 2017 WL 1373252, at *5 (Bankr. D. Del. Apr. 13, 2017) (collecting cases and finding "range" method inappropriate for historical range of 34 to 371 days).

The Trustee argues that the "range" approach is too simplistic because it bases the entire analysis on outlying payments rather than addressing average changes in the amount and frequency of payments. The Trustee instead urges the Court to use a "standard deviation" method. The Trustee identified the median days from invoice to payment (21 days) and applied a standard deviation of 18 days, establishing an "ordinary course" range of 3 to 39 days from invoice to payment. That range encompasses 85.9% of historical-period invoices and 87.1% of historical-period payments by dollars paid. The Trustee argues that payments during the preference period that fell outside that range should not be considered "ordinary." According to the Trustee's calculations, $11,350 of payments fell outside that range and should not be subject to the "ordinary course of business" exception. While not as broadly employed as the "range" method, some courts have used the "standard deviation" method for "ordinary course of business" analyses. *Pereira v. United Parcel Serv. Of Am. Inc. (In re Waterford Wedgwood USA, Inc.)*, 508 B.R. 821, 837 (Bankr. S.D.N.Y. 2014); *Friede Goldman Halter, Inc. v. Aircomfort, Inc. (In re Consol. FGH Liquidating Tr.)*, 392 B.R. 648, 661 (Bankr. S.D. Miss. 2008). Lone Star argues the "standard deviation" method is inappropriate because under that method, some payments must almost always fall outside of the standard deviation range and thus outside the ordinary course of business.

### ii. The QuickReport Spreadsheet

For their analyses, both parties rely on a QuickReport spreadsheet submitted by Lone Star. In the first section, the QuickReport summarizes all of Lone Star's invoices to the Debtors, and in the second section, it lists the date range between the shipment date and payment date and delivery date and payment date for each invoice. Henderson says the QuickReport is an accurate summary of all the parties' transactions and that the Trustee has been sent all the underlying

documents used to formulate the summary. The Trustee argues that the Court should not consider the QuickReport, however, because it contains inaccuracies.

In addition to the QuickReport, Lone Star submitted the four checks issued during the preference period. The check issued on May 31, 2018 includes an attached summary of the invoices for which the check pays. Twenty-two invoices are listed. Seven of those invoices either do not appear anywhere in the QuickReport or only appear in one section.[9] This indicates that the QuickReport is either incomplete, missing at least the invoices on the May 31 check and possibly more, or that the May 31 check inaccurately lists the invoices it covers. Additionally, one invoice from the May 31 check is only listed in the first section of the QuickReport and shows a shipment and delivery date in September 2016. If the QuickReport's listing of that invoice is correct, then, contrary to Lone Star's assertion, there actually was a maximum range between shipment date and payment date of almost two years, not ninety-seven days.

A summary may be introduced to prove the content of writings so long as the underlying writings are voluminous and in-court examination of them would be inconvenient. Fed. R. Evid. 1006;[10] *Wooten v. Fed. Exp. Corp.*, No. 3:04-CV-1196-D, 2007 WL 63609, at *25 (N.D. Tex. Jan. 9, 2007) (citing *United States v. Stephens*, 779 F.2d 232, 239 (5th Cir. 1985)). Such summaries are admissible at trial or at the summary judgment stage. *Encompass Off. Sols., Inc. v. Conn. Gen. Life Ins. Co.*, No. 3:11-CV-02487-L, 2017 WL 3268034, at *9 n.4 (N.D. Tex. July 31, 2017). Because the invoices underlying the QuickReport are certainly voluminous and inconvenient to examine, a summary of them was appropriately introduced here.

---

[9] Invoices 40231, 40309, and 40322 appear nowhere in the QuickReport. Invoices 39643 and 40314 only appear in the first section of the QuickReport. Invoice 40027 appears twice in the second section. Invoice 40352 appears only in the second section.

[10] See note 7.

However, if a party can point to evidence that brings the accuracy of a summary into doubt, then that evidence may raise a genuine dispute of material fact. *See Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Bristol Manor Healthcare Ctr., Inc.*, 153 F. Supp. 3d 363, 375 (D.D.C. 2016). When analyzing whether transactions fall under the subjective test of § 547(c)(2), a transaction history is of great significance, and the underlying facts that form the parties' transaction history are therefore material. *See Broadway Festivals*, 2022 WL 120199, at *5. Here, the QuickReport is critical to Lone Star's "range" method and the Trustee's "standard deviation" method—both parties' calculations come directly from the figures in the QuickReport. By pointing the Court to the inconsistencies between the May 31 check and the QuickReport, the Trustee has brought the credibility of Henderson and the accuracy of the QuickReport into question.

The Trustee has therefore raised a genuine issue of material fact that cannot be decided at the summary judgment stage. The Court will not adopt either the "range" method or the "standard deviation" method of analysis, as the Court cannot adequately employ either method with underlying facts in dispute.

### b. "Postpetition" Payment

The Trustee also argues that the "ordinary course" defense is not applicable against the $3,400 transfer because that transfer was made postpetition. Although the issuance date on the check is July 20, 2018—within the preference period—the Trustee says the check did not clear the Debtors' bank account until after the Debtors filed bankruptcy. Not only does the Trustee argue that this precludes the "ordinary course" defense, but he also argues that summary judgment should be granted in his favor, finding that the check is avoidable under § 549. Under that section,

> the trustee may avoid a transfer of property of the estate—
>> (1) that occurs after the commencement of the case; and
>> (2) (A) that is authorized only under section 303(f) or 542(c) of this title; or
>>     (B) that is not authorized under this title or by the court.

§ 549(a).  A transfer under § 549 is deemed to have occurred when the check has cleared the debtor's bank account.  *Faulkner v. Lone Star Car Brokering, LLC (In re Reagor-Dykes Motors, LP)*, No. 18-50214-RLJ-11, 2021 WL 2546664, at *4 (Bankr. N.D. Tex. June 21, 2021).

The Court has the power to grant summary judgment to the nonmoving party, as the Trustee implicitly requests.  *Pollock v. Birmingham Tr. Nat'l Bank*, 650 F.2d 807, 810 (5th Cir. Unit B July 1981); *see also Celotex*, 477 U.S. at 326.  However, that power "has been attended with the most important qualification: Absent an otherwise effective abandonment, the party against whom judgment is rendered must not be foreclosed from litigating issues of fact material to any surviving claims."  *Pollock*, 650 F.2d at 810.  At the summary judgment stage, the § 549 argument was raised for the first time in the Trustee's response; Lone Star did not raise the issue in its summary judgment motion, and its only opportunity to respond was by its reply, which is not the proper pleading for new arguments and evidence.  The Trustee's response points to no evidence that proves the check cleared postpetition.  Lone Star tacitly agreed at the hearing that the $3,400 check cleared postpetition.  But that concession was made in the context of the "ordinary course" defense, not to concede to a § 549 claim, and Lone Star also pointed to no evidence as proof.  Given this, it is inappropriate for the Court to grant summary judgment to the Trustee on his § 549 claim as the Trustee has failed to present a sufficient factual basis for his claim and Lone Star has not been given adequate opportunity to present contradicting facts.

## V.     Conclusion

This is Lone Star's, the defendant's, motion for summary judgment.  The Trustee's evidence establishes the basic elements of a preference—a transfer within 90 days on account of

an antecedent debt—but there is no evidence by either the Trustee or Lone Star of which Debtor received the services or made the payments. The Court, through judicial notice, has determined that the Debtor Reagor-Dykes Motors, LP is the likely obligor (on the antecedent debts) and the transferor of the payments. The Court therefore denies summary judgment on the substantive preference claims.

Because the evidence submitted by Lone Star to support its "new value" defense either raises issues of credibility or was submitted too late to allow for a meaningful response by the Trustee, genuine issues of material fact exist on this defense. Because the Trustee successfully brought the accuracy of Lone Star's evidence supporting its "ordinary course of business" defense into question, genuine issues of material fact exist for such defense as well. And because Lone Star has not been given adequate opportunity to address the Trustee's "postpetition transfer" claim, summary judgment for the Trustee on that issue likewise fails.

The Court denies Lone Star's motion for summary judgment.

### End of Memorandum Opinion ###